UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


John Burke

    v.                                  Civil No. 07-cv-00207-JL
                                          Opinion No. 2008 DNH 165

Ceridian Corporation


**O R D E R**


    John Burke, a Hudson, New Hampshire resident formerly employed at the Boston office of Ceridian Corporation, has sued Ceridian through a four-count amended complaint alleging age discrimination and violation of 29 U.S.C. § 621-634 (2001) and N.H. Rev. Stat. Ann. 354-A:7 (1995 & Supp. 2007), as well as state law claims alleging tortious interference with business relations, wrongful discharge, and breach of contract.

    This court has jurisdiction under 28 U.S.C. § 1331 (2001) (federal question) and specifically, 29 U.S.C. § 626 (civil action for age discrimination).

    Ceridian has moved, under Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings on Counts II (tortious interference with business relations), III (wrongful discharge), and IV (breach of contract). See F.R.C.P. 12(c) (2008). Burke has conceded that Ceridian is entitled to judgment on the pleadings on the tortious interference and wrongful

discharge claims.  After oral argument, and in consideration of the parties' pleadings and their various arguments, for the reasons set forth below, the court grants Ceridian's motion for judgment on the pleadings as to the breach of contract claim.

I.    **APPLICABLE LEGAL STANDARD**

A Rule 12(c) motion for judgment on the pleadings is evaluated under the same standard for deciding a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted.  Pasdon v. City of Peabody, 417 F.3d 225, 226 (1st Cir. 2005); see also Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  In order to survive such a motion, the "complaint must contain factual allegations that raise a right to relief above the speculative level," Perez-Acevedo, 520  at 29 (quotations omitted), and "requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); see also Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").[1]  Because a Rule 12(c) motion "calls for an

---

[1] Until recently, the pleading standard for a motion to dismiss set a higher bar for the movant, requiring that the

2

assessment of the merits of the case at an embryonic stage," the facts contained in the pleadings are constructed in the light most favorable to the nonmovant and the court must draw all reasonable inferences from those facts in the nonmovant's favor. Perez-Acevedo, 520 F.3d at 29. The following background facts are set forth in accordance with this standard.

II. **BACKGROUND**

Ceridian, a provider of human resources software to businesses, employed Burke as a sales representative on its Boston-based sales team for 25 years. During that time, Burke worked primarily from his home office in New Hampshire. When he was discharged on November 29, 2004, Burke was 55 years old, the oldest member of the Boston sales team.

For 16 of his 25 years at Ceridian, Burke received an award given to Ceridian's top-performing sales representatives. From

---

complaint be maintained "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Conley v. Gibson, 355 U.S. 41, 45-46 (1957), abrogated by Bell Atl. Corp., 127 S. Ct. at 1969. In 2007, however, the Supreme Court retired the "no set of facts" formulation in favor of the standard quoted above, which requires more of the nonmovant. Bell Atl. Corp., 127 S. Ct. at 1969. This new pleading standard applies to both Rule 12(b)(6) motions to dismiss and Rule 12(c) motions for judgment on the pleadings. Perez-Acevedo, 520 F.3d at 29.

1980 to 2000, Burke regularly met or exceeded his annual sales quota. From 2001 to 2004, Burke was less successful in reaching his annual sales quota, due to various factors, including: (1) an unsuccessful experimental "selling approach" adopted by Ceridian, (2) a lack of sales leads resulting from the new approach, (3) a reduction in his geographical sales territory, and (4) customer returns.

In early 2004, Burke's supervisor, John O'Donnell, notified Burke in writing that his sales quota and "call activities" were not at an acceptable level, and placed Burke on a "Success Plan" listing goals Burke was to achieve by February 27, 2004.[2] According to the "Success Plan," if the goals were not achieved, Burke would face disciplinary action, possibly including termination. According to the complaint, Burke met the specified goals, and O'Donnell "took him off the plan" in February, 2004.

In 2004, O'Donnell continued in his position as Vice President of Sales, but assigned Stephen Gardner to directly supervise Burke. Shortly after he began supervising Burke, Gardner expressed concerns about Burke's performance, but told

---

[2] The goals, according to Burke's complaint, included a minimum of 100 telephone "dials" for appointments per week, a minimum of two new "prospect appointments" per week, two "direct mails to territory prospects" per month, scheduling his manager for a minimum of two new calls per month, and prior approval of his weekly activity calendar by a superior.

4

Burke that he would not take disciplinary action for 60 days to allow him to better understand Burke's performance. In September, 2004, Gardner placed Burke on another "Success Plan" because he had only attained 46% of his annual sales quota. Like the original plan, this one outlined goals Burke was to achieve by October 4, 2004, or face disciplinary action, possibly including termination.[3] Burke achieved some of the goals under the second "Success Plan," but made no sales.

On October 11, 2004, Ceridian placed Burke on a "Performance Improvement Plan" (PIP). The document memorializing the PIP stated that Burke's sales attainment at that time was 41%, and it listed goals more rigorous than those set forth under the "Success Plans." Significantly, Burke does not allege in his complaint that the documents memorializing the PIP, or any of his superiors at Ceridian, promised him continued employment with Ceridian for any definite or indefinite term in connection with Burke's attainment of the PIP's listed goals. He also does not allege that there was a promise of continued employment with

---

[3] According to the complaint, the "plan included 50,000 Sales Order Values for September, a minimum of 80 telephone dials for appointments per week, a minimum of three face to face appointments per week, two direct mails to territory prospects per month, submission of a pre-approved weekly activity calendar, and a funnel of two times his monthly sales quota, etc. 'Funnel' or 'pipeline' are terms used to indicate promising sales prospects."

Ceridian while pursuing the goals.  Burke partially satisfied the PIP's listed goals, but again, closed no sales.  On November 8, 2004, the PIP was renewed and extended until December 4, 2004, in a document that noted that Burke's attainment rate on his annual sales quota was 36%.

Ceridian terminated Burke's employment on November 29, 2004, citing poor performance as the reason for termination.  Burke's complaint alleges that Gardner conveyed, and O'Donnell approved, the termination and that both Gardner and O'Donnell knew that "Burke had a pipeline" (promising sales prospects) in excess of his annual sales quota.

Burke's complaint alleges that in 1994, O'Donnell gave him the nickname "Repasaurus," intending to convey that Burke was, at that time, the oldest sales representative on the Boston sales team, and that the nickname stuck.  In fact, the "Repasaurus" moniker was invoked during Ceridian's 2004 annual sales meeting, at which Burke was "honored" for his 25 years of employment with the company.  Burke's complaint alleges that the nickname reflected the prevailing mindset at Ceridian that those of Burke's age were ready for "extinction."  The complaint further alleges that O'Donnell and Gardner directed promising sales leads to "new sales representatives much younger than Burke," and that all of his accounts were redistributed to younger members of the

Boston sales team.  His complaint alleges that representatives of significant customers landed by the Boston sales team after Burke's termination were prepared to testify that Burke had been critical in their decisions to purchase software from Ceridian.

Finally, Burke alleges that as of December, 2004, Ceridian's Boston sales team had members with ages ranging from 31 to 55, with an "average age" of 40.  As of January, 2007, Burke alleges, the ages ranged from 31 to 46, with an "average age" of 38.  He further claims that at the time of his termination, approximately 120 other Ceridian sales representatives, "most of whom were under 40 years old," were performing at levels below Burke's, but were not terminated, and that he was replaced on April 4, 2005, by a 40 year old individual.  Finally, Burke adds that the Boston group's second-oldest sales representative was terminated in 2007.

## II. **ANALYSIS**

### A. **Breach of contract**

Count IV of Burke's complaint alleges a breach of contract claim.  Ceridian argues that judgment should be entered in its favor on the pleadings because "Burke has simply failed to allege any express or implied contractual undertaking by Ceridian (not subsumed by his wrongful discharge claim as an at-will employee)

7

that has been breached by Ceridian." In other words, Ceridian argues, Burke was at all times an at-will employee, and he has not alleged any facts that amount to the creation of an employment contract or contractual term that it could have breached. Burke counters that Ceridian's imposition of "performance plans" like the "Success Plans" and the PIPs, and his acceptance of those plans through his continued employment with Ceridian, constituted contractual arrangements breached by Ceridian when it terminated him before he was able to close the sales in his "pipeline."

"Under the common law of New Hampshire, a breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Sabinson v. Trustees of Dartmouth College, 2007 DNH 141, 47 (brackets and quotations omitted) (quoting Bronstein v. GZA GeoEnvironmental, Inc., 140 N.H. 253, 255 (1995)). Of course, this presupposes the existence of a contract, the essential elements of which are offer, acceptance, consideration, and a meeting of the minds. See Tsiatsios v. Tsiatsios, 140 N.H. 173, 178 (1995).

"As a general rule, the interpretation of a contract is an issue of law for this court to resolve." Dillman v. New Hampshire College, 150 N.H. 431, 434 (2003) (citing Erin Food

Servs., Inc. v. 688 Props., 119 N.H. 232, 235 (1979)). "Where, however, there are disputed questions of fact as to the existence and terms of a contract, they should be resolved by the jury." Dillman, 150 N.H. at 434 (emphasis added) (citing Maloney v. Boston Dev. Corp., 98 N.H. 78, 82 (1953)).  Even so, "[b]efore such issues can be submitted to the jury, the trial court must determine whether there is any evidence from which a reasonable jury could find a contract between the parties."  Dillman, 150 N.H. at 434.  In the context of a Rule 12(c) motion for judgment on the pleadings, this requires the court to scrutinize Burke's Amended Complaint to determine whether it contains any allegations from which a contract or contractual undertaking could be discerned.

It is undisputed that, prior to Ceridian's imposition of the "performance plans," Burke was an at-will employee. "Of course," as Burke points out, "an employer and an employee may alter the at-will status of the employment relationship." Smith, 76 F.3d at 426 (citing Butler v. Walker Power, Inc., 137 N.H. 432, 436 (1993)). "Such a modification sometimes may be accomplished if the employer makes a binding offer that the employee can accept by remaining on the job." Smith, 76 F.3d at 426. To find alteration of at-will status, however, the new contractual terms must be definite so that there is reasonable certainty about the

contours of the new employment relationship.  Id.; Cf. Jesep v. N.E. Health Care Quality Foundation, No. 04-CV-77-JD, 2005 WL 958405, at *7 (D.N.H. Apr. 27, 2005).

Burke argues that this is just such a situation, wherein Ceridian offered Burke the opportunity to meet the goals as set forth in the Success Plans and PIPs, and Burke accepted the offer by continuing to work for Ceridian.  This assertion, however, mischaracterizes the terms of the four "performance plans."  More importantly, it ignores the fact that the Amended Complaint--the basis for a Rule 12(c) judgment on the pleadings analysis--makes no allegation that the Performance Improvement Plans, in particular, were accompanied by anything resembling a promise of any kind, including one of continued employment.  And Ceridian could not identify any such PIP-memorialized promise at oral argument.

Nor can any such promise be inferred from the fact that, at the time of his termination, Burke was working subject to a "PIP."  Although the New Hampshire Supreme Court has held "that continued service by an employee who was free to leave his job at any time may be seen as consideration for an employer's offer to modify employment terms favorably to the employee," Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 736 (1988) (emphasis added) (citing Gilman v. County of Cheshire, 126 N.H. 445, 449 (1985)),

this is not such a case.  Ceridian did not offer to modify Burke's employment terms in a manner favorable to Burke; rather, it put him on notice of goals it expected him to reach.[4]  And at least with respect to the final PIP, during the pendency of which Burke was terminated, the pleadings reveal no promise to continue or extend his employment or refrain from terminating him.  Cf. Butler, 137 N.H. at 437 (absent a clear statement about change in at-will status, a step discipline policy, although enforceable, did not create tenure for employee).

Further, even if one were to accept the proposition that each, or any, of the four "performance plans" contained an implicit promise not to terminate Burke if he met the list of performance goals by the required date, an employment contract would not have been created, because it would not have altered the at-will nature of Burke's employment as of the termination date of each of the four plans.  "A contract to reinstate an at-

---

[4] At oral argument Burked argued that the "performance plans" could be viewed as terms, offered by Ceridian and favorable to him, because (1) Ceridian could have simply fired him instead of subjecting him to such a plan, and (2) the performance plans could be viewed as "guidance" in the performance of his duties.  Court IV (the breach of contract count) of his complaint, however, unambiguously characterizes the performance plans as "unreasonably demanding," (Am. Comp. ¶83), and inferentially noted that not placing other employees on such plans amounted to favorable treatment for them.  (Id., ¶82).  The performance plans did not offer terms favorable to Burke.

will employee to an at-will position (from which she could immediately be removed without cause) is no contract at all." Smith, 76 F.3d at 426 (citing E. Allan Farnsworth Contracts §§ 2.13, 2.14 (2d ed. 1990) (explaining that promises to maintain an at-will relationship are illusory)).

Because this court concludes that imposition of any or all of the multiple performance plans did not modify Burke's at-will employment status, it grants Ceridian's 12(c) motion on this count.

## IV. CONCLUSION

Accordingly, Ceridian's motion for judgment on the pleadings is granted as to Count II (tortious interference with business relations, with respect to which Burke confessed judgment), Count III (wrongful discharge, with respect to which Burke confessed judgment), and Count IV (breach of contract). Burke may proceed on the statutory age discrimination claim set forth in Count I in the normal course.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

```
Dated:   September 2, 2008

cc:   Scott H. Harris, Esq.
      Michael J. Kenison, Esq.
      Jill K. Blackmer, Esq.
      Martha Van Oot, Esq.
```